**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Cora Skinner, et al., | No. CV-18-00319-TUC-RCC |
| Plaintiff, | **ORDER** |
| v. | |
| Tuscan, Inc., et al., | |
| Defendant. | |

Pending before the Court are Defendant's Motions to Strike Report and Testimony of Martin Buncher (Doc. 48) and Stephen Chamberlin (Doc. 49), and Plaintiffs' Motion to Strike Report and Testimony of Michael Einhorn (Doc. 43). This matter has been fully briefed. (Docs. 43–45, 48–49, 53–54, 56–57.) The Court finds oral argument will not aid in the resolution of the issues raised. *See* LRCiv 7.2(f); Fed. R. Civ. P. 78(a); *Mahon v. Credit Bureau*, 171 F.3d 1197, 1200 (9th Cir. 1999). As set forth below, the Court denies all motions.

Plaintiffs Cora Skinner, Jaime Edmondson Longoria, Jessica Rockwell, Lina Posada, Lucy Pinder, Nikki Leigh, and Ursula Mayes ("Plaintiffs") raise state law claims of right of publicity/misappropriation of likeness and false light/invasion of privacy. They also raise claims under the Lanham Act for false advertising and false association. Plaintiffs allege that Defendant Tuscan, Inc. d/b/a Ten's Nightclub ("Defendant" or "Ten's") unlawfully used Plaintiffs' photographs to advertise its strip club by posting Plaintiffs' images on Defendant's Instagram, Facebook, and Twitter without permission.

Plaintiffs claim that the use of their photographs created the false impression that they were somehow associated with, approved of, or employed at Ten's. Furthermore, Plaintiffs assert that because Defendant did not pay them for the photo shoots, it deprived Plaintiffs of the income they would have received but for Defendant's unlawful use of the photographs. Plaintiffs seek actual damages, disgorgement of profits, treble damages, punitive damages, compensatory damages, reasonable attorneys' fees, costs, and interest.

The parties have retained their respective experts in this matter. Plaintiffs retained Martin Buncher to conduct a survey to measure the likelihood of consumer confusion resulting from Defendant's use of Plaintiffs' photographs. Plaintiffs also retained Stephen Chamberlin to establish actual damages. Defendant retained Michael Einhorn to establish its valuation of damages. All experts have been challenged by the opposing party.

## I.     Standard of Review – Expert Testimony

As a threshold matter, "evidence is admissible so long as (1) it is relevant, and (2) it is not otherwise inadmissible under, *inter alia*, the Federal Rules of Evidence." *United States v. Evans*, 728 F.3d 953, 960 (9th Cir. 2013) (citing Fed. R. Evid. 402). Federal Rule of Evidence 702 outlines when proposed expert testimony is admissible. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592–93, n.10 (1993). Rule 702 states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. The party seeking to present expert testimony has the burden of showing by a preponderance of the evidence that the expert is qualified and that his or her evidence is admissible. *United States v. Hankey*, 203 F.3d 1160, 1168 (9th Cir. 2000). "The qualification standard is meant to be broad and seek a 'minimal foundation' justifying the expert's role as an expert." *Allen v. Am. Capital Ltd.*, 287 F. Supp. 3d 763, 776 (D. Ariz. 2017) (quoting *Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1015–16 (9th Cir. 2004)). Years of relevant experience can establish the necessary "minimal foundation." *See Hangarter*, 373 F.3d at 1015–16 (finding that twenty-five years of working as an independent consultant and an expert witness in the insurance industry satisfied the "minimal foundation" necessary to provide expert testimony). "Disputes as to the strength of [an expert's] credentials . . . go to the weight, not the admissibility, of his testimony." *Kennedy v. Collagen Corp.*, 161 F.3d 1226, 1231 (9th Cir. 1998) (quoting *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1044 (2d Cir. 1995)).

Additionally, to be admissible, expert testimony must be both relevant and reliable. *Daubert*, 509 U.S. at 589. A court has broad discretion in deciding whether to permit a proposed expert's testimony, but it "cannot abdicate its role as gatekeeper" by leaving the determination of relevance or reliability to the fact finder. *Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 464 (9th Cir. 2014). Nonetheless, "Rule 702 was not meant to supplant 'the traditional and appropriate means of attacking shaky but admissible evidence,' including '[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof.'" *Gray v. LG&M Holdings LLC, et al.,* No. CV-18-02543-PHX-SRB, Doc. 121 at 16 (D. Ariz. Sept. 3, 2020) (quoting *Daubert*, 509 U.S. at 596).

### a. Relevance

In general, evidence is relevant if it "has 'any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'" *Daubert*, 509 U.S. at 587 (quoting Fed. R. Evid. 401). An expert's testimony must also "logically advance[] a material aspect of

1   the proposing party's case" to qualify as relevant. *Daubert v. Merrell Dow Pharms.*

2   *(Daubert II)*, 43 F.3d 1311, 1315 (9th Cir. 1995).

3           *b. Reliability*

4           A court's inquiry into whether expert testimony is reliable is "a flexible one."

5   *Estate of Barabin*, 740 F.3d at 463. The court may determine reliability of expert

6   testimony by assessing several factors, including whether the expert's technique or theory

7   (1) can be tested; (2) has been peer reviewed or published; (3) has a known or potential

8   basis for error; and (4) is generally accepted in the pertinent scientific community.

9   *Hankey*, 203 F.3d at 1168. Moreover, "survey evidence should be admitted 'as long as [it

10  is] conducted according to accepted principles and [is] relevant.'" *Fortune Dynamic, Inc.*

11  *v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025, 1036 (9th Cir. 2010).

12          Additionally, a court may assess the reliability of an expert by considering (1) the

13  expert's specialized knowledge, education, skill, or training in an area relevant to the area

14  of testimony; (2) whether the expert's techniques are pertinent to the conclusions

15  presented; and (3) whether the probative value of the expert's opinion is substantially

16  outweighed by unfair prejudice. *Hankey*, 203 F.3d at 1168. The objective "is to make

17  certain that an expert, whether basing testimony upon professional studies or personal

18  experience, employs in the courtroom the same level of intellectual rigor that

19  characterizes the practice of an expert in the relevant field." *Kumho Tire Co.*, 526 U.S. at

20  152.

21          Here, the proposed experts are assessed in turn.

22  **II.    Martin Buncher**

23          Plaintiffs wish to present a survey and report produced by Mr. Buncher to aid "a

24  jury in assessing whether Defendant's advertisements were likely to cause consumer

25  confusion" to support their false association claim. (Doc. 53 at 3.) Plaintiffs also believe

26  Mr. Buncher's analysis is relevant to whether the Plaintiffs are recognizable, therefore

27  Mr. Buncher's testimony supports their right of publicity, false light, and false

28  association claims.

1

        *a. Mr. Buncher's Knowledge, Education, Skill, and Training*

2      Mr. Buncher's background reflects fifty-five years of experience conducting

3  research studies in marketing communications. He is active in several groups that

4  promote marketing research. He has contributed to a textbook about marketing

5  communications, and even taught college courses on the subject. Moreover, Mr. Buncher

6  has participated in over twenty studies in similar strip club cases, investigating the role of

7  women in each defendant's advertising. Defendant does not challenge Mr. Buncher's

8  extensive qualifications. The Court finds Mr. Buncher's experience evinces reliability.

9           *b. Mr. Buncher's Survey*

10     In Mr. Buncher's survey, Defendant's advertisements with Plaintiffs' photos were

11  presented to two groups, with approximately six hundred participants in total. Selected

12  participants, half of whom were men, resided within a certain radius of Ten's and had

13  attended strip clubs in the previous two years. Participants were asked a series of

14  questions based on the advertising images.

15     Based on the results of the survey, Mr. Buncher concluded that (1) 65% of

16  participants thought Plaintiffs were affiliated with Ten's; (2) 82% believed Plaintiffs

17  sponsored, endorsed, or promoted Ten's; (3) 84% presumed Plaintiffs approved of their

18  images being used in Ten's advertising; (4) 75% believed Plaintiffs were part of the

19  stripper lifestyle; (5) 66% thought Plaintiffs participated in Ten's activities; and (6) 85%

20  believed Plaintiffs had been paid for the use of their image. Moreover, Mr. Buncher

21  found that around 15% of participants believed they recognized Plaintiffs.

22           *c. Defendant's Objections to Survey and Report*

23     Defendant has the following objections to Mr. Buncher's survey and his

24  conclusions about consumer confusion. Defendant asserts that Mr. Buncher's survey is

25  unreliable and irrelevant because:

26  ///

27  ///

28  ///

1)    It did not contain a control group and the control question was insufficient;
2)    The survey questions were "improper, confusing, misleading, and include undefined and ambiguous terms";
3)    There was no option to answer "no opinion" or "don't know," or instruction to the participant not to guess;
4)    Participants were not representative of Ten's clientele and the survey failed to consider prior exposure to Ten's nightclub and the survey made no attempt to account for potential bias;
5)    The survey did not "meet generally acceptable survey principles or methods";
6)    The cumulative survey errors render it unreliable; and;
7)    The survey was not relevant to any issue in this case.

(Doc. 48.) In addition, Defendant attacks Mr. Buncher's ability to provide his expert opinion in this case because his testimony was stricken in other similar cases based on the arguments listed above.

i.   Control Group and Control Question

Defendant believes Mr. Buncher's survey and report are unreliable because Mr. Buncher failed to utilize a control group. Mr. Buncher explained that the survey was a communications study designed to evaluate what messages Defendant's advertisements communicated to the audience. Unlike a causal study, he claims, communications studies do not require a control group. And so, instead of a control group, Mr. Buncher utilized a control question that excluded Plaintiffs' images from Defendant's ads and asked participants how the exclusion affected participants' perception of the advertisement. This, he claims, is "consistent with the logic of the Diamond research standard." (Doc. 48-2 at 11 (citing Sheri S. Diamond, Reference Guide on Survey Research, Reference Manual on Scientific Evidence, 359 (Federal Judicial Center, 3d ed. 2011).) Defendant also believes the control question was inadequate because it notified the respondent of the purpose of the survey by drawing attention to the absence of the Plaintiffs' photo.

When considering the admissibility of an expert opinion, objections based on an expert's "methodology [and] survey design . . . go to the weight of the survey rather than its admissibility." *Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1263 (9th Cir.

2001). A party may debate a survey's alleged inadequacies through vigorous cross-examination. *See Marsteller v. MD Helicopter Inc.*, No. CV-14-01788-PHX-DLR, 2018 WL 3023284, at *1–2 (D. Ariz. May 21, 2018).

Defendant's argument constitutes a challenge to Mr. Buncher's methods. As such, the argument goes to the weight, not the admissibility. Plaintiffs have shown by a preponderance of the evidence that Mr. Buncher's method follows accepted principles. Defendant may challenge the method through cross-examination.

ii.   Confusing Questions and Limited Answers

Next, Defendant argues the survey was fundamentally flawed because it did not give participants the ability to indicate they had no response, no opinion, or did not know the answer. Mr. Buncher states that according to two published perspectives—one in the realm of psychology and the other communications——permitting these non-responses would actually *increase* the amount of guessing. (Doc. 48-2 at 16 (first citing Dean Peabody, *Two components in bipolar scales: Direction and extremeness*, Psychological Review 69(2), 1969; then citing John R. Rossiter & Larry Percy, Advertising Communications and Promotion Management (McGraw-Hill, 2d ed. 1997).) He explains that "questions which exclude the 'don't know' option produce a greater volume of accurate data than those that do." (Doc. 48-2 at 16.) The Court finds Plaintiff has shown this method is reliable by a preponderance of the evidence. Whether the exclusion actually increased or decreased the accuracy of responses can be debated through cross-examination.

Defendant also believes the survey was flawed because participants were not given the opportunity to specify Plaintiffs' true names and could not express uncertainty. Because of this, Defendant claims, no Plaintiff has been truly identified and the survey results cannot measure identifiability. The Court disagrees, it is possible to recognize a person without recalling their name. In fact, as the undersigned is learning all too well, with age this occurs more and more frequently. Regardless of the Court's interpretation, however, Mr. Buncher's method of identifying Plaintiffs is a methodological objection

1   that goes to weight, not admissibility.

2          In addition, Defendant believes certain terms in the survey were too ambiguous to

3   be reliable. For instance, the survey asked whether the participants felt the Plaintiff

4   enjoyed the *lifestyle* portrayed by the strip club or participated in Ten's *events*. Defendant

5   would also like further explanation of the words *enjoy* and *probably*. These words are not

6   specific and can lead to biased responses, Defendant claims. Moreover, Defendant

7   objects to Mr. Buncher's use of the word *ads* in reference to Plaintiffs' images with Ten's

8   promotional material and would prefer the words *pictures* or *social media posts*.

9   "'[T]echnical inadequacies' in a survey, 'including the format of the questions or the

10  manner in which it was taken, bear on the weight of the evidence, not its admissibility.'"

11  *Fortune Dynamic, Inc.*, 618 F.3d at 1036. Defendant argues semantics; these challenges

12  to the technical inadequacies of the survey go to the weight of the evidence and are better

13  assessed by a jury.

14                 iii.   <u>Representative Sample</u>

15         Defendant claims that the survey is flawed because Mr. Buncher did not explain

16  how participants were contacted, selected, or paid. Also, the survey was not a

17  representative sample of Ten's clientele because Mr. Buncher used far too many women.

18  The survey utilized 50% women, but Ten's has predominantly male customers. This

19  could lead to biased and inaccurate responses.

20         Mr. Buncher explained that the survey targeted a random selection of recent strip

21  club patrons residing in the vicinity of Ten's. Participant selection was managed by Luth

22  Research Incorporated, which "uses a proprietary, patented system of referrals and case

23  rewards" and "reaches millions of people worldwide." (Doc. 48-2 at 13.) Mr. Buncher

24  also stated the reason the survey used 50% women was to isolate gender to determine

25  whether the message portrayed in the ads differed by sex. As Defendant did not provide a

26  clientele list to Plaintiffs, it is difficult to say how a more accurate representative sample

27  of Ten's clientele could be obtained. This is a methodological argument, and Mr.

28  Buncher has adequately explained the means of obtaining participants and reasoning

behind the final selection.

In addition, Defendant claims Mr. Buncher did not account for participants' prior attendance at Ten's and knowledge of Ten's advertising. Again, Mr. Buncher's failure to account for prior exposure to Ten's is an argument about methodology and does not render the survey and report inadmissible.

### iv.   "Generally Acceptable Survey Principles or Methods"

Defendant claims that the survey does not follow generally acceptable survey principles or methods for various reasons. However, Mr. Buncher has explained his methodology, and has also indicated he created the survey to conform "with the generally accepted standards and procedures in the fielding of surveys set forth by the American Marketing Association, Marketing Research Association, CASRO and ESOMAR" and "[t]he survey was designed to meet the criteria for survey trustworthiness detailed in the Federal Judicial Center's Manual for Complex Litigation, Fourth." (Doc. 48-2 at 7.) The Court finds Plaintiffs have shown by a preponderance of the evidence that the report and survey rely on acceptable methods. Defendant may challenge the basis for these methods at trial.

### v.   Relevance

Defendant also contends that Mr. Buncher's survey was not a relevant measure of confusion because the questions did not require participants to name Plaintiffs; participants were only permitted to provide a yes or no response when asked whether they recognized Plaintiffs. Therefore, Defendant asserts, there can be no conclusion that any participant identified Plaintiffs.

Defendant attempts to create a distinction between recognition and true recognition. Assertedly true recognition requires the participants name each Plaintiff. Defendant has not supported this assertion with case law, and the Court will not require the higher level of recognition to find the results are relevant. As discussed previously, a fact finder may determine that a Plaintiff is identifiable even if the Plaintiff has not been named.

1    Moreover, the survey results are relevant to establishing participant confusion as

2    to whether Plaintiffs approved of, associated with, or promoted Ten's. This confusion is

3    relevant to Plaintiffs' false association claim. Plaintiffs have met their burden of

4    demonstrating Mr. Buncher's testimony is relevant to a material issue in this case.

5                   vi.    Reliability

6    The cumulative errors listed above, Defendant asserts, make the survey and report

7    unreliable. "[M]ethodological deficiencies in a survey generally relate to the weight given

8    the survey's conclusions rather than to its admissibility . . . [but] when the deficiencies

9    are so substantial that they render the survey's conclusions untrustworthy, the court

10   should exclude the survey from evidence." *J & J Snack Foods, Corp. v. Earthgrains Co.*,

11   220 F. Supp. 2d 358, 369 (D.N.J. 2002). The Court finds that Mr. Buncher has provided

12   adequate reasoning for his methods, and Defendant's objections do not prove that

13   substantial deficiencies in the survey render it unreliable. Rather, Defendant raises

14   arguments that may be properly used on cross examination to attempt to undermine

15   Buncher's methodology and the credibility of his testimony.

16                  vii.   Other Courts

17   Finally, Defendant argues that Mr. Buncher's survey and report should be

18   precluded because it was not permitted under similar circumstances in the Southern

19   District of New York. *See Edmondson v. RCI Hosp. Holdings, Inc.*, No. 16-CV-2242

20   (VEC), 2020 WL 1503452 (S.D.N.Y. Mar. 30, 2020) (striking Mr. Buncher's report for

21   methodological flaws); *see also Toth v. 59 Murray Enterprises, Inc.*, No. 15-CV-8028,

22   2019 WL 95564, at *8 (S.D.N.Y. Jan. 3, 2019) (same). Defendant's argument overlooks

23   a key difference in the standard for admissibility of survey evidence between the Second

24   and Ninth Circuits. *See Gray*, No. CV–18–02543–PHX–SRB, Doc. 121. While the

25   Second Circuit may exclude survey evidence upon a finding that the methodology is

26   lacking, in this circuit questionable methodology goes to the weight, not the

27   admissibility. *Id.* (quoting *Wendt v. Host Int'l, Inc.*, 125 F.3d 806, 814 (9th Cir. 1997))

28   ("Challenges to survey methodology go to the weight given the survey, not its

1    admissibility."). Moreover, while Mr. Buncher's survey and report may have been
2    rejected in other courts, thus far it has been unilaterally permitted in the District of
3    Arizona in similar cases. *See Gray*, No. CV–18–02543–PHX–SRB, Doc. 121; *Electra v.*
4    *Id. Bus. Holdings LLC*, No. CV–18–01604–PHX–SRB, Doc. 80 (D. Ariz. Sept. 24,
5    2020); *Geiger v. Creative Impact Inc.*, No. CV–18–01443–PHX–JAT, Doc. 96 (D. Ariz.
6    June 17, 2020).

7        The Court finds that Mr. Buncher's survey and report are sufficiently relevant and
8    reliable and are admissible at trial. Defendant may raise any objections to Mr. Buncher's
9    methodology through effective cross-examination.

10   **III.    Stephen Chamberlin**

11       Plaintiffs retained Mr. Chamberlin to establish actual damages, that is, the fair
12   market value of the right to use Plaintiffs' photographs in Defendant's advertisements.
13   Mr. Chamberlin has estimated actual damages at an aggregate amount of $435,000. He
14   arrived at this amount using the hypothetical negotiation test. Mr. Chamberlin first
15   calculated each Plaintiff's day rate—how much they would have been paid to produce the
16   photographs used by Ten's under a hypothetical negotiated contract—and then multiplied
17   the day rate by the number of distinct uses of each photograph by Defendant. Mr.
18   Chamberlin's estimated day rate varies by individual Plaintiff because he tailored his
19   assessment based on, among other factors, each Plaintiff's past modeling contracts.
20   Defendant challenges Mr. Chamberlin's conclusions on the basis that they are unreliable
21   and prejudicial.

22               *a.  Reliability*

23       Defendant argues that Mr. Chamberlin's conclusions are unreliable, challenging
24   (1) his method of calculating each Plaintiff's day rate, and (2) his reliance on a "usage
25   multiplier."

26       As to the first step of Mr. Chamberlin's formula, Defendant posits that Mr.
27   Chamberlin's choice to assess "each Plaintiff's most lucrative contract" renders his
28   working day rate estimates unreliable. (Doc. 49 at 2.) Specifically, Defendant states that

he failed to explain his reasoning behind selecting those particular contracts while disregarding other relevant contracts and he neglected to consider the scope of the selected contracts. (*Id.*)

Furthermore, Defendant claims that Mr. Chamberlin "applie[d] a flawed methodology to his inflated working rates." (*Id.*) Specifically, it believes that, because Mr. Chamberlin multiplied the day rate by each use of the photographs, he "improperly assume[d] that separate licenses would have been agreed upon for each use of an image, rather than the issuance of a single license for all uses of each image." (*Id.* at 10 (quoting *Toth*, 2019 WL 95564, at *8).) Finally, Defendant alleges that none of the disclosed modeling contracts use the kind of "usage multiplier" for distinct usages like advertisements, branding, and social media; rather, Defendant states, the contracts reflect a flat rate per job.

Plaintiffs counterargue that Mr. Chamberlin's day rate calculations are properly based on his extensive experience in the modeling industry as well as a review of each Plaintiff's career. Additionally, they assert that Mr. Chamberlin need not have relied on Plaintiffs' least lucrative modeling contracts. Instead, recognizing "that models get paid different rates based on the job and the product they are promoting," he selected contracts that reflect the day rate Plaintiffs would have received had they been hired to create photographs for use in advertisements for Defendant's strip club. (Doc. 54 at 4.)

Plaintiffs also assert that Mr. Chamberlin's multiplication of the day rate by each use of a photograph is accepted methodology in the modeling industry. They state that "any modeling agent would consider [various different uses] when negotiating a modeling contract." (*Id.* at 6.)

Ultimately, a party's disagreement with the sources upon which the expert bases his or her conclusions goes to weight of the evidence and not admissibility. *See Solis v. Bridgestone Corp.*, No. CV-10-484-TUC-DCB, 2013 WL 12098802, at *3 (D. Ariz. Apr. 2, 2013) ("Questions related to the bases and sources of an expert's opinion . . . should be left for the consideration of the finder of fact a[s] these questions affect the weight to be

1    assigned to an expert's opinion rather than its admissibility."). The fact that Mr.

2    Chamberlin, in accordance with his specialized knowledge in the industry, chose to rely

3    primarily on contracts where Plaintiffs were paid more does not alone render his

4    testimony unreliable. Defendant may endeavor to discredit Mr. Chamberlin's selective

5    assessment of Plaintiffs' contracts on cross-examination, but his choice of sources does

6    not alone preclude his testimony.

7                        *b. Prejudice*

8            Additionally, Defendant makes the cursory assertion that Mr. Chamberlin's

9    testimony and report should be excluded under Federal Rule of Evidence 403. Rule 403

10   permits the court to "exclude relevant evidence if its probative value is substantially

11   outweighed by a danger of . . . unfair prejudice . . . ." Defendant states that Mr.

12   Chamberlin's "report and opinions are so flawed that they are grossly prejudicial" and

13   this prejudice outweighs any probative value. (Doc. 49 at 2.)

14           The Court disagrees. The fact that Mr. Chamberlin's estimated fair market value is

15   significantly higher than that of Defendant's expert does not alone render his testimony

16   unfairly prejudicial.

17                       *c. Other Courts*

18           Finally, Defendant contends that the Court should follow the Southern District of

19   New York in excluding Mr. Chamberlin's testimony in similar matters. *See Toth*, 2019

20   WL 95564, at *12–13; *Edmondson*, 2020 WL 1503452, at *8–10. The courts in *Toth* and

21   *Edmondson* found Mr. Chamberlin's conclusions unreliable because he did not explain

22   his reliance on some contracts and not others, did not account for the difference in scope

23   between those contracts and the type of hypothetical photo shoot at issue here,

24   improperly accounted for each use of the photographs rather than simply all uses of each

25   photograph, and calculated excessive damages.

26           However, as discussed above, these criticisms of Mr. Chamberlin's choice of

27   sources and methodology do not bear on the threshold question of admissibility. Rather,

28   they will be properly considered by the finder of fact as to the weight of Mr.

1   Chamberlin's expert opinion. Furthermore, as with Mr. Buncher's testimony, thus far Mr.

2   Chamberlin's testimony has been unilaterally permitted in the District of Arizona in

3   similar cases. *See Gray*, No. CV–18–02543–PHX–SRB, Doc. 121; *Electra*, No. CV–18–

4   01604–PHX–SRB, Doc. 80; *Geiger*, No. CV–18–01443–PHX–JAT, Doc. 96. Thus,

5   because Mr. Chamberlin's conclusions are sufficiently reliable and not unfairly

6   prejudicial, they are admissible.

7       **IV.   Michael Einhorn**

8           Defendant retained Dr. Einhorn to refute Mr. Chamberlin's conclusions and

9   establish a competing valuation of actual damages. Like Mr. Chamberlin, Dr. Einhorn

10   estimated "the amount that would be determined in a hypothetical arms-length

11   negotiation." (Doc. 43-1 at 8.) He began by calculating the day rate and dividing this rate

12   by the number of images likely to be produced in a one-day photo shoot. Dr. Einhorn

13   then subtracted a 20% modeling agent fee and multiplied the final amount by the number

14   of uses of the photograph. Ultimately, he concluded that the total actual damages incurred

15   by Plaintiffs ranges from $1,990 to $3,980. Plaintiffs challenge Dr. Einhorn's opinions

16   arguing that he is unqualified to serve as an expert and that his conclusions are unreliable

17   and irrelevant.

18       *a.  Qualifications*

19           As an initial matter, Plaintiffs assert that Dr. Einhorn does not qualify as an expert

20   for purposes of assessing the particular issues in this case because he "has never

21   negotiated a modeling contract, and knows nothing about the modeling industry." (Doc.

22   43 at 2.) Dr. Einhorn's methodology, Plaintiffs argue, is evidence of his lack of

23   qualifications. Specifically, Plaintiffs contend that Dr. Einhorn failed to conduct a

24   comparable analysis when he relied on fifteen undisclosed modeling contracts that

25   models other than Plaintiffs negotiated with lingerie companies. Furthermore, Plaintiffs

26   assert that Dr. Einhorn's day rate estimation is not individualized: Dr. Einhorn merely

27   paraphrases information he found via an internet search; his analysis fails to account for

28   variation in the individual Plaintiff's modeling careers; and he neglects to assess value

1   based on how Defendant used the individual photographs.

2       Defendant details Dr. Einhorn's professional experience as a forensic economist

3   and as an expert witness in cases involving "intellectual property, media, entertainment,

4   technology, trademarks, publicity rights, and product design." (Doc. 44 at 3.) It notes

5   that, although Dr. Einhorn has never negotiated a modeling contract, he "is an expert in

6   analyzing markets, prices, and valuations." (*Id.* at 7.)

7       The Court finds that Dr. Einhorn qualifies as an expert. Although he lacks

8   experience in the modeling industry, his training and career as an economist, and as a

9   valuation expert, demonstrate that he has the requisite technical knowledge to justify his

10  role as an expert in the present case. The fact that Dr. Einhorn has never negotiated a

11  modeling contract is an attack on his credentials that goes to the weight of Dr. Einhorn's

12  testimony, not to admissibility. Moreover, to the extent that Plaintiffs critique Dr.

13  Einhorn's methodology as a means of challenging his qualifications, the Court addresses

14  methodology in the following sections.

15      *b. Reliability*

16      Next, Plaintiffs assert that Dr. Einhorn's methodology renders his conclusions

17  unreliable. Specifically, they challenge his use of fifteen undisclosed modeling contracts

18  and Dr. Einhorn's failure to analyze Plaintiffs' own past contracts and earnings. Plaintiffs

19  claim the unrelated contracts between other models and lingerie companies are not

20  comparable to a contract between Plaintiffs and Ten's. They also contend that Dr.

21  Einhorn failed to address key details regarding his use of the fifteen contracts including

22  "what services were performed under these contracts . . . what the undisclosed alleged

23  models were paid for their undisclosed services" and "why these undisclosed contracts

24  would be an appropriate starting off point . . . ." (Doc. 43 at 5–6.) Additionally, Plaintiffs

25  argue that Dr. Einhorn's conclusions cannot be reliable because he used an internet

26  search of the phrase "working day rate, models" to support his day rate calculations. (*Id.*

27  at 6.) Finally, they object to Dr. Einhorn's discussion of the purported final image price

28  and his conclusion that between six and twelve photographs are produced in a day.

1    Plaintiffs assert his analysis ignores the fact that day rates are negotiated before a photo

2    shoot and the number of images has no bearing on the pre-negotiated day rate.

3    Defendant explains that Dr. Einhorn was unable to draw a "straight line" between

4    the information in Plaintiffs' disclosed contracts and the facts of this case. (Doc. 44 at 4.)

5    He, therefore, assessed fifteen modeling contracts for lingerie companies that he opined

6    were comparable. After reviewing these contracts, Dr. Einhorn calculated an average day

7    rate of between $2,000 and $2,500. The internet search, Defendant asserts, was market

8    research to corroborate Dr. Einhorn's estimations, during which he found that a 50%

9    premium applied in similar risqué photo shoots. Finally, Defendant contends that Dr.

10   Einhorn disclosed the lingerie companies involved in the fifteen contracts but did not

11   reveal the names of the models for confidentiality reasons.

12   The Court finds that Dr. Einhorn's opinions are sufficiently reliable. As noted

13   previously, issues with the sources of an expert's testimony do not decide whether the

14   testimony is admissible. Rather, these issues should be considered by the fact finder in

15   assessing the weight of the expert's testimony. Finally, that Dr. Einhorn used an internet

16   search to lend additional support to his calculations does not alone render his conclusions

17   unreliable.

18       *c. Relevance*

19   Additionally, Plaintiffs argue that Dr. Einhorn's opinions are not relevant because

20   they will not help the finder of fact assess the evidence. Specifically, Plaintiffs assert that

21   Dr. Einhorn's opinion is no different than that of a layperson because Dr. Einhorn relied

22   on an internet search to assist him in his analysis. Furthermore, Plaintiffs challenge the

23   relevance of the unverified websites that Dr. Einhorn reviewed.

24   Defendant clarifies that Dr. Einhorn's internet search constituted specialized

25   market research that cannot be performed by a layperson and that he used this research to

26   corroborate the conclusions he drew from the fifteen contracts he assessed. In addition,

27   Defendant asserts that Dr. Einhorn verified the websites he reviewed.

28   The Court finds that Dr. Einhorn's conclusions are relevant. As discussed above,

the fact that he conducted internet research in addition to reviewing modeling contracts is an issue of the expert's sources that must be weighed by the fact finder. Moreover, Dr. Einhorn's conclusions go to a material aspect of Defendant's case—that is, the valuation of actual damages—and, like Mr. Chamberlin's conclusions, Dr. Einhorn's have a tendency to make Defendant's determination of damages more or less probable than it would be without his analysis.

### d.  Other Courts

Finally, because Dr. Einhorn utilized internet search results in his analysis, Plaintiffs urge this Court to exclude his testimony based on *D'Pergo Custom Guitars, Inc. v. Sweetwater Sound, Inc.*, No. 17-cv-747-LM, 2020 WL 60351, at *5 (D.N.H. Jan. 6, 2020). In *D'Pergo*, the district court excluded Dr. Einhorn's expert testimony as to trademark infringement damages because it found that his conclusions lacked independent analysis and would not be helpful to the finder of fact. It specifically noted that Dr. Einhorn did no more than "merely paraphrase[] [customer] affidavits and then state[] that [he] is unable to opine on D'Pergo's lost profits." *Id.*

The Court disagrees that a similar issue exists here. Dr. Einhorn relied on more than the results of his internet research to estimate the day rate. He reviewed Mr. Chamberlin's report as well as fifteen other modeling contracts that he believed were comparable to the case and "model testimony" regarding how many images can be shot in one day. (Doc. 43-1 at 74.) Therefore, the Court finds that Dr. Einhorn's report contains independent analysis and will be helpful to the jury.

Moreover, like the other experts, despite being precluded in certain cases, in this district under similar circumstances Dr. Einhorn's testimony has been permitted. *See Gray*, No. CV–18–02543–PHX–SRB, Doc. 121; *Electra*, No. CV–18–01604–PHX–SRB, Doc. 80; *Geiger*, No. CV–18–01443–PHX–JAT, Doc. 96.

### V.    Conclusion

The Court finds that the parties have demonstrated by a preponderance of the evidence that Mr. Buncher, Mr. Chamberlin, and Dr. Einhorn's testimony are relevant

and reliable. Each expert shall be permitted to testify to their expert opinions at trial.

Accordingly, IT IS ORDERED:

1) Defendant's Motion to Strike Report and Testimony of Martin Buncher is DENIED. (Doc. 48.)

2) Defendant's Motion to Strike Report and Testimony of Stephen Chamberlin is DENIED. (Doc. 49.)

3) Plaintiff's Motion to Strike Report and Testimony of Michael Einhorn is DENIED. (Doc. 43.)

Dated this 7th day of October, 2020.

Honorable Raner C. Collins
Senior United States District Judge